UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------- X

BKK Solutions, LLC f/k/a BCK Medical   :
Holdings, LLC,   :
  :    Civil Action No._____
  Plaintiff,   :
  :
  :
v. Sensiva Health LLC, Tarun Jolly, Jim   :    District Judge _____
Silliman, and Ben Williamson,   :
  :
  Defendants.   :
  :    Magistrate Judge _____
  :
  :
-------------------------------------------------- :
  X

## **COMPLAINT**

1.     In late 2020, at the height of the Covid-19 pandemic, Defendant Sensiva Health, LLC ("Sensiva") rushed development of new personal testing kits, known as the "reAct" kit, which were designed to detect the presence of Covid-19 in users. These kits, however, would prove to be ineffective and unsuitable for any market because they did not detect Covid-19 accurately and had much shorter shelf lives than was represented on the packaging. Unsurprisingly, reAct kits were never authorized for sale by the FDA and, indeed, Sensiva abandoned its efforts to obtain such regulatory approval.

2.     Sensiva's losses from this failed venture were minimal or non-existent, however, because Sensiva and its controlling persons ("Defendants") had duped Plaintiff BKK Solutions, LLC ("BKK") into investing more than $10 million in this doomed business, with such investment covering Sensiva's costs of production, shipping, storage and marketing. Sensiva fraudulently obtained this investment from BKK through numerous misrepresentations and omissions.

3.     Specifically, Defendants, who knew full well that BKK had no expertise in the FDA's regulatory approval process, directly assured BKK on multiple occasions that regulatory approval was guaranteed and imminent because, at any time, Sensiva could submit reAct for approval through a special process with the United States Department of Health and Human Services ("HHS"), which Sensiva represented was an alternative to the FDA approval process and would provide "automatic" approval within two weeks.  Although BKK did not know it at the time, this alternate approval process through HHS was pure fiction, invented by Defendants to give BKK a false impression that reAct shortly would receive regulatory approval.

4.     Sensiva also failed to disclose known issues with reAct that rendered it ineffective and unmarketable, including its inability to detect the presence of Covid-19 accurately and its short shelf life.  Instead, Sensiva provided an express warranty that reAct would be free from material defects.  Sensiva also continued to misrepresent the quality of the reAct kits even after the tests were criticized by the FDA, international governmental regulators, and customers.  Sensiva did not disclose any issues with the reAct kits to BKK until one year after BKK's investment, at which point Sensiva disclosed that the kits could not be sold in the United States, contrary to their own prior guidance.  By that point in time, Sensiva had developed a *competing* product in secret, which was functionally the same as reAct but that, apparently, did not include the same product defects as reAct.

5.     Based on Sensiva's fraudulent misrepresentations, BKK invested $9.8 million in early 2021 to cover *all* of Sensiva's production costs for approximately 1.6 million units of the reAct kits, all of which have proven to be unmarketable and useless.  In further reliance on Sensiva's fraudulent misrepresentations, BKK continued to invest over $150,000 throughout 2021 to pay

third parties to transfer, store, and market this ineffective product, both domestically and internationally.

6.     BKK *never* would have made such a significant investment in Sensiva if it had known either that (i) automatic approval by HHS was *not* a real process that Sensiva could pursue, or that (ii) reAct was *not* free from material defects, as had been warranted expressly.

7.     BKK seeks recovery for damages, lost profits, and all other appropriate amounts under Sections 10(b) and 20(a) of the Securities Exchange Act, as well as under Louisiana state law causes of action that this Court may consider pursuant to its supplemental jurisdiction.

## JURISDICTION AND VENUE

8.     BKK asserts claims that arise under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1.  Accordingly, this Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

9.     BKK also asserts claims under Louisiana state law.  Such claims are so related to the claims arising under the Exchange Act that they form part of the same case or controversy under Article III of the United States Constitution.  Accordingly, this Court may assert supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a).

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C § 78aa.

11.    BKK and Sensiva are parties to a Distribution and Reseller Agreement dated December 24, 2020 (the "Agreement").[1]  Section 32 of the Agreement states that all parties consent to the

---

[1] In an abundance of caution as concerns any claim of confidentiality, the Agreement is not attached hereto.  The provisions discussed herein do not concern any purportedly confidential information.

"exclusive jurisdiction" of "State or Federal Courts in Orleans Parish, Louisiana" regarding the claims asserted herein.

## PARTIES

12.    Plaintiff BKK is a Florida limited liability company, which was formerly known as BCK Medical Holdings, LLC.

13.    Defendant Sensiva is a Louisiana limited liability company.

14.    Defendant Tarun Jolly ("Jolly") is a Louisiana resident who is an owner and principal for Sensiva.   When Sensiva was founded in March 2020, Jolly was its sole member and manager. Jolly has since continued to sign corporate filings on behalf of Sensiva.   Although Plaintiff presently is unaware of Jolly holding a formal title at Sensiva, Jolly acted as the primary decision maker with respect to the events and activities alleged herein.   Upon information and belief, Jolly is the majority or largest owner of Sensiva and assisted in the development of the reAct kits, along with Jim Silliman.

15.    Defendant Jim Silliman ("Silliman") is the Chief Executive Officer for Sensiva.   Upon information and belief, he is a resident of Louisiana.

16.    Defendant Ben Williamson ("Williamson") is the Chief Operating Officer for Sensiva. Upon information and belief, he is a resident of Florida.

17.    Defendants Jolly, Silliman, and Williamson each exercised control over Sensiva and are referred to as "Control Defendants" herein.

## BACKGROUND

### I.     Sensiva Attempts To Capitalize On Public Demand For Covid-19 Test Kits With A Product That Would Require Outside Investment

18.     In late 2020, market demand for effective, safe, and reliable Covid-19 testing kits greatly exceeded supply in the United States and throughout the world.  In this context, many companies were working quickly to develop testing kits that could be sold to the public.

19.     Sensiva, which describes itself on its website as a "healthcare solutions company," developed plans for a saliva-based test kit, which would have the brand name "reAct."  The reAct tests purportedly were designed to provide consumers with both (i) a quick testing result through a saliva-based rapid antigen test, and (ii) a more thorough testing result from a PCR laboratory testing of a saliva sample.  Sensiva's marketing materials for the reAct tests suggested that they could provide accurate and reliable results in as little as three minutes, allowing clients to test large groups of people in very short amounts of time.  Sensiva also advertised reAct as being able to detect all variants of COVID-19.

20.     Sensiva, however, faced several significant issues that prevented it from commercializing the reAct test in late 2020/early 2021.

21.     *First*, in late 2020, Sensiva had not received approval from the FDA to sell reAct in the United States.  In fact, Sensiva did not even apply for approval until December 17, 2020.

22.     *Second*, upon information and belief, Sensiva knew or should have known that the reAct tests suffered from severe efficacy and quality control issues.  Specifically, the tests did not provide an effective means of detecting Covid-19 and, even when they worked, they had much shorter shelf lives than Sensiva stated publicly.  These issues created a substantial risk that Sensiva might never be able to obtain FDA approval for reAct.

23.   *Third*, upon information and belief, Sensiva knew or should have known that there were material problems with the EUA application that it had submitted to the FDA.   Specifically, Sensiva sought to have reAct approved by comparing it to an approved PCR test from an affiliated entity, but Sensiva improperly used this comparator test in a way that had *not* been approved by the FDA, which undermined the comparison.   Further, upon information and belief, Sensiva violated FDA guidance by choosing *not* to test the reAct kits on samples including low viral loads, where the presence of Covid-19 would be harder to detect.   As a result of these and other issues, some of which still may be unknown to BKK today, Sensiva knew or should have known that FDA approval was unlikely.

24.   *Fourth*, even if there were a reasonable prospect of obtaining FDA approval, Sensiva lacked sufficient financial resources to purchase essential components for the reAct tests in quantities necessary to enable mass production of the kits.   Sensiva knew that it would require a significant investment from one or more third-party investors to get its reAct business off the ground. Although Sensiva, alone, would need to address the first three issues, Sensiva hatched a plan to address the fourth issue by  seeking out third-party investment to fund Sensiva's costs of production.   However, Sensiva knew it could only attract such an investor by fraudulently concealing the first three issues.

## II.   Sensiva Convinces BKK To Invest In ReAct Based On False Assurances Of Imminent Regulatory Approval

25.   Sensiva found the investor it was looking for in BKK's predecessor in interest, BCK Investments, LLC ("BCK Investments"), which was a holding company owned by Ben Kazenmaier ("Kazenmaier").

26.    BCK Investments invested in a company owned by Kevin Griffon ("Griffon"), who had worked on the successful sale and distribution of PCR nasopharyngeal swabs throughout the

United States and, accordingly, had the resources, contacts, and experience required to distribute the reAct kits.  Kazenmaier was able to assist Griffon with logistics and sourcing capital.

27.    Sensiva and BKK, through BCK Investments, met in early December 2020 based on a pre-existing friendship between Allen Frederic ("Frederic"), who served as an advisor to BCK Investments, and Sensiva's attorney who served as legal counsel to Sensiva.  Frederic was a former partner at the same law firm where Sensiva's attorney was a current partner.

28.    Sensiva and BKK, through BCK Investments, held their first meeting on December 15, 2020, before Sensiva had submitted its initial application to the FDA, at BCK Investments' office in New Orleans.  For BCK Investments, the meeting was attended by Kazenmaier, Frederic, and Griffon.  For Sensiva, the meeting was attended by Jolly and Sensiva's attorney.

29.    At this initial meeting, the parties discussed a variety of topics, which included the reAct test kits, Sensiva's capital needs, and BCK Investments' distribution contacts.

30.    As Sensiva was aware, BCK Investments intended to form a special purpose entity to invest in the reAct business and distribute the kits to customers.  This special purpose entity would become known as BCK Medical Holdings, LLC, which is the former name of BKK.

31.    As discussed in this and subsequent meetings, BKK was expected to serve two roles: (1) to provide the funding to cover Sensiva's costs for manufacturing reAct, and (2) to retain third-party distributors to sell reAct domestically. Sensiva represented that it would be able to perform all manufacturing and logistical sourcing on its own, so long as BKK covered the costs of Sensiva's efforts.

32.    Sensiva also represented that BKK only would need to locate domestic distributors because Sensiva purportedly had already lined up a sales agent to handle international sales.  In

truth, Sensiva's agent had not yet done anything to pursue sales in any international market or even to understand the regulatory hurdles it would face if it attempted to market reAct internationally.

33.   Following the success of the initial meeting on December 15, a second meeting was held between Jolly, Sensiva's attorney, Kazenmaier, Frederic, and Griffon on or around December 17. This second meeting was when the parties first discussed the FDA approval process for reAct.

34.   On December 17, after BKK and Sensiva had already begun negotiations, Sensiva submitted its application to the FDA.  Shortly after doing so, Sensiva informed BKK by email that "we are able to start using and selling [reAct] instantly."

35.   At all relevant times, Sensiva knew that no one at BKK had any experience with the FDA approval process and, as such, BKK was entirely reliant on Sensiva to provide accurate and honest representations regarding the likelihood and timeline for FDA approval of reAct.  Sensiva also knew that BKK likely would rely on Sensiva's guidance regarding the regulatory approval process because Sensiva had retained regulatory counsel and BKK did not (and did not need to).  This knowledge presented Sensiva with an opportunity to conceal the critical issues that it knew or should have known it would face obtaining regulatory approval for reAct.

36.   At the second meeting, Jolly and Sensiva's attorney informed Kazenmaier, Griffon, and Frederic that Sensiva already had applied for reAct to the FDA, but that Sensiva did not know the timing on when such approval would be granted.  Neither Jolly nor Sensiva's attorney suggested that approval might not be granted; they only stated that approval could be delayed.  Jolly and Sensiva's attorney also stated that they expected a response soon from the FDA, based on their prior experience seeking FDA approvals.

37.   Of course, a material delay in FDA approval would be highly concerning to any potential investor or distributor, so Sensiva sought to provide additional (and false) assurance that approval

was imminent.  Specifically, Jolly stated to Kazenmaier, Griffon, and Frederic that even if the FDA approval were delayed, there was an "alternative" route to approval that Sensiva could obtain by filing a request with HHS.  According to Jolly, approval by HHS would be granted "automatically" within two weeks once an application was filed.

38.   During a phone call between Frederic and Sensiva's attorney in late December 2020, Sensiva's attorney, on Sensiva's behalf, again represented that this HHS alternative existed and, as a result, January 15 was the "outside date" upon which regulatory approval would be granted.

39.   As a direct result of Sensiva's fraudulent misrepresentations of there being an "automatic" path to approval in just two weeks under this alternate procedure with HHS, BKK reasonably believed in mid-December 2020 that approval for reAct would be obtained by mid-January 2021.  Given the seemingly imminent approval, the international sales agent that purportedly had already been retained, and the fact that Sensiva appeared to be pursuing other potential investors, BKK believed that it would need to act quickly to capitalize on this seemingly lucrative opportunity.  That is precisely the mindset that Sensiva had hoped to create.

40.   In truth, approval was not imminent and Sensiva knew it because the HHS alternative *did not exist* and Sensiva had not already retained an international sales agent.  Moreover, upon information and belief, Sensiva knew or should have known of significant issues set forth above regarding reAct and its EUA application.  Yet Sensiva did not disclose these issues—or the non-existence of the HHS alternative—to BKK at any time.

III.   **Sensiva Quickly Obtains BKK's Investment And Participation In The ReAct Business**

41.   Based on Sensiva's false assurances that approval was imminent, Kazenmaier directed Frederic to negotiate with Sensiva's attorney a definitive agreement between Sensiva and BKK, through BCK Investments.  Those negotiations began on December 17, 2020.

42.    Within 24 hours, Sensiva and BKK agreed that BKK would make an investment in Sensiva's reAct business pursuant to the following terms:

    a.  BKK would finance the manufacturing of reAct kits by covering all of Sensiva's production costs;

    b.  BKK would sell reAct domestically, which Sensiva knew would be accomplished through third-party distributors retained at BKK's expense;

    c.  Sensiva and BKK would split profits 60/40 from those third parties' eventual sale of the reAct kits to consumers; and

    d.  BKK would remain the exclusive distributor so long as they met all of Sensiva's financing requirements within 48 hours' notice.

43.    Sensiva, through its attorney, provided BKK, through Frederic, with an initial draft of an agreement to document this transaction on or around December 23, 2020.  This draft was structured as a distribution and reseller agreement but contained the basic terms of an investment as described above.

44.    When presenting this draft, Sensiva's attorney warned Frederic that Sensiva already had other potential distributors lined up who would be willing to make a similar investment and, accordingly, Sensiva was not willing to engage in any substantive renegotiation of any term in the draft.  Effectively, Sensiva presented its proposed investment terms under "take it or leave it" conditions.

45.    To induce BKK's investment with minimal review or input, Sensiva's attorney, on behalf of Sensiva, again stated to Frederic, on behalf of BKK, that regulatory approval for reAct was imminent, either through the FDA or through the HHS.  Sensiva's attorney stated explicitly that regulatory approval would be obtained through one of these alternatives by "January 15 or

thereabouts."  These statements were false, as Sensiva knew that the HHS alternative did not exist and that Sensiva had no way of knowing if or when the FDA would approve reAct.

46.    The draft agreement also contained an express warranty by Sensiva that the reAct kits would be "free from material defects in material and workmanship under normal use and service with proper maintenance for the time of their intended use following manufacturing."  This, too, was false.  Unbeknownst to BKK, the reAct kits were not free from material defects.  They could not detect Covid-19 accurately or reliably, particularly in samples with lower viral loads, and they expired well before the expiration of their stated "time of . . . intended use following manufacturing."  Sensiva sought to conceal such issues in its EUA application, and it similarly sought to conceal them from BKK during their negotiations.  This false warranty was repeated in the Agreement.

47.    Seeking to act on this supposedly lucrative investment opportunity before Sensiva passed it to a competitor, and fully relying on the false representations stated above, BKK signed the Agreement on December 24, 2020, less than one week after Frederic and Sensiva's attorney first began negotiating BKK's investment in Sensiva's reAct business and less than 48 hours after receiving the initial draft from Sensiva.

48.    The Agreement represents that Sensiva's initial production capabilities would be 50,000 units per week and that it was expected that this weekly manufacturing capability would increase over time.  The Agreement also represents that Sensiva intended to reach a point where it would be able to manufacture 2,350,000 units on a weekly basis.  This amount is referred to in the Agreement as the "Minimum Weekly ROFR reACT Capacity Amount."

49.    According to the Agreement, so long as Sensiva had not yet reached the Minimum Weekly ROFR reACT Capacity Amount, BKK would have the "exclusive right to acquire all or

any portion of" the units produced, without exception.  However, once Sensiva hit the Minimum Weekly ROFR reACT Capacity Amount, it only would need to offer BKK a right of first refusal to purchase the units within 48 hours.  In such a scenario, BKK would be required to purchase *all* of the available capacity or else it would lose its exclusivity rights in the future.

50.    In either scenario, the purchase price that BKK would need to pay was "the price paid" by one of Sensiva's manufacturers "to source components and manufacture [reAct] test kits." Thus, Sensiva realized no profit from "selling" the reAct kits to BKK.  Instead, *both* Sensiva and BKK expected to realize profits only after third parties retained by BKK sold the kits to ultimate customers and then shared 60% of the profits with Sensiva.

51.    As a result of this Agreement, Sensiva could manufacture as many units as it wanted and force BKK to fund all production costs for those units under threat of BKK losing its exclusivity. If BKK wished to keep its exclusivity, its potential investment under this Agreement had no limit. Such predatory and one-sided terms were deemed acceptable by BKK only because of the express misrepresentations made by Sensiva, including those regarding approval being imminent by the FDA or HHS.

52.    The Agreement is governed by Louisiana law.

**IV.    Sensiva Demands Nearly $10 Million In Investment From BKK While Continuing To Conceal The Truth And Repeat Its Fraudulent Misrepresentations**

53.    On January 10, 2021, Sensiva first notified BKK that its initial production capacities would enable it to produce 300,000 test kits by the end of January, with 150,000 units being produced during the weeks of January 21 and January 28.  In order to fund the manufacturing of these 300,000 units, Sensiva gave BKK 48 hours to make an advance payment of $1.8 million. BKK duly made this payment on January 10.

54.    On January 18, 2021, Sensiva and BKK amended the Agreement to include a provision that made it mandatory, once FDA approval was obtained, for BKK to purchase all kits that Sensiva produced on a weekly basis up to the Minimum Weekly ROFR reACT Capacity Amount.

55.    Just two days later, on January 20, 2021, Jolly and Sensiva's attorney met with Kazenmaier, Griffon, and Frederic at BKK's office to discuss a significant issue with a Chinese company that provided the primary components for the reAct kits.   According to Jolly and Sensiva's attorney, the Chinese company was threatening to shut down for a full month to celebrate the Chinese New Year unless Sensiva made an upfront payment of $7-$8 million dollars.   Sensiva requested that BKK make this investment and treat it as an advanced payment for an additional 1.3 million units.   Sensiva's attorney stated falsely that this was a "notice of manufacturing capacity" under the Agreement, which, if true, might trigger BKK's 48-hour payment obligation.

56.    In truth, BKK had no obligation to fund this additional $8 million investment.   Unlike BKK's initial payment of $1.8 million to fund production of 300,000 kits, this investment was untethered to Sensiva's manufacturing capabilities.   Sensiva did not provide any indication that it would be able to manufacture 1.3 million units or that $8 million would correctly represent Sensiva's costs for doing so.   This $8 million investment was, instead, an unexpected necessity just to ensure manufacturing was not paused for a month due to *Sensiva*'s failure to manage its own relationship with its own manufacturers properly.

57.    Naturally, BKK objected to making such a large investment when (1) it had no contractual obligation to do so, (2) the initial 300,000 kits that it *had* paid for had not yet been manufactured, and (3) Sensiva had not yet obtained authorization to sell these kits in the United States.

58.     To induce BKK to make this investment that it had no obligation to make, Jolly, on behalf of Sensiva, again dangled the prospect of an imminent approval from the FDA or HHS during the meeting on January 20, 2021.  These representations continued to be false.  Yet, they served their intended purpose of incentivizing BKK to continue to invest in this business.

59.     On January 21, 2021, Sensiva's attorney, Jolly, and Frederic participated in a phone call to further discuss the $8 million investment.  During this call, Frederic asked Jolly about the (non-existent) HHS alternative.  Given the repeated misrepresentations that such an alternative existed, Frederic asked for an "outside date" by which Sensiva would pursue that alternative if Sensiva still had not received approval from the FDA. Jolly stated that March 15, 2021, would be a reasonable deadline by which Sensiva should pursue the HHS deadline, unless the FDA had given some indication of imminent approval.

60.     Sensiva's misrepresentations worked.  Based on the false assurance that the HHS alternative existed and likely would be pursued no later than March 15, BKK agreed to make the $8 million investment.

61.     BKK and Sensiva amended the Agreement on January 27, 2021, to reflect this additional investment.  Under this amendment, the $8 million investment was structured as an "advance" for which BKK would receive a 20% finance fee and "such number of reACT Test Kits equal to the Advance divided by six," which is approximately 1.3 million units.  BKK would be permitted to deduct the full amount of this investment plus the 20% finance fee from all future payments under the Agreement until BKK received the 1.3 million kits, which was expected to occur by March 15, 2021.

62.     BKK made this $8 million investment on January 28, 2021.  Consistent with Sensiva's misrepresentation that the HHS alternative existed and likely would be pursued no later than March

15, 2021, BKK financed this $8 million investment primarily with a loan bearing a maturity date of March 15, 2021.

63.   As a result of investing a total of $9.8 million in Sensiva's reAct business, BKK received 1.6 million reAct kits (including the 300,000 that it acquired earlier in January 2021) that it would need to sell to customers for BKK (and Sensiva) to realize a profit.  The $9.8 million investment covered Sensiva's costs, meaning that only BKK had any financial risk if these kits could not be sold.

64.   BKK never would have invested $9.8 million in Sensiva's business, or invested tens of thousands of dollars in start-up costs, if not for the express assurances from Sensiva that there was an "automatic" process to have reAct approved by HHS within two weeks, nor would BKK have made such investment if Sensiva had disclosed the existence of material defects with reAct that might preclude FDA approval.  Even after executing the Agreement, BKK had no affirmative obligation to make these payments, but it did so in express reliance on Sensiva's false representations.

65.   On January 31, 2021, Jolly, on behalf of Sensiva, represented to BKK in an email that "FDA [approval] is an inevitability that may not happen as fast as we like, but should happen soon."  This unambiguous assurance that approval was "inevitable" is consistent with the numerous fraudulent representations that Sensiva already had made to BKK.

66.   At the same time that Sensiva was demanding a nearly $10 million investment from BKK, Sensiva submitted a second EUA application to the FDA in January 2021 and a third application in February 2021.  These subsequent applications included significant changes to reAct's description of its testing steps, product manufacturing, and assay buffer composition. Despite these significant changes, Sensiva's subsequent applications continued to rely in the same

validation testing that had been submitted with its first application in December 2020. Upon information and belief, Sensiva knew that this was inappropriate because the FDA required such testing to be performed on the final product to be approved.

## V. BKK Engages Sales Agents, Who Are Unable To Sell ReAct Without Regulatory Approval

67. As Sensiva knew or should have known, BKK did not intend to sell the reAct kits itself but would, instead, engage third-party sales agents to make such sales. Aside from funding Sensiva's manufacturing costs, BKK's only obligations would be administrative. To the extent that any sales agent or customer had questions about the product, such questions would need to be addressed by Sensiva directly.

68. By the end of February 2021, BKK had engaged the Elizarov Consulting Group ("ECG") and several other independent sales agents to sell reAct. By March 15, 2021, ECG, alone, sent reAct samples to more than 80 potential customers. They also reached out to dozens of other potential customers who did not request samples. Some of the customers contacted by ECG had the capacity to purchase *all* available inventory if they had had an interest in doing so.

69. In addition to ECG, BKK also retained other sales agents with contacts and expertise in particular industries, which allowed BKK to reach other potential buyers.

70. As Sensiva was aware, the plan to sell reAct in the United States prior to regulatory approval depended on customers having an interest in buying at a "pre-approval" discount. But such an option was only attractive to potential customers so long as they believed approval was imminent. The longer it took for this approval to be obtained, the less attractive such discounted sales became for customers.

71. Moreover, none of the potential customers had heard of the HHS alternative and, in hindsight, it appears likely that the sales agents' discussion of this alternative, which they did not

know to be a work of fiction created by Sensiva, hurt their credibility when speaking with sophisticated customers.

72.    At the end of the March 2021, Sensiva still had not obtained approval from the FDA and did not pursue approval through the fictional procedure with HHS, nor could they.   Absent regulatory approval, BKK's sales agents were unable to generate any interest in reAct among potential customers in the United States, who reasonably were wary of purchasing unapproved testing kits in a market where approved alternatives were becoming increasingly more common.

**VI.    Sensiva Fails To Obtain FDA Approval And Lies About Submitting A Second Application, All While Developing A Competing Product In Secret**

73.    If there truly was an alternative method to approval through HHS that functioned as Sensiva had described it— "automatic" approval within two weeks—pursuing that alternative by March 15, 2021, meant that approval would be obtained by the end of March 2021.

74.    On April 21, 2021, the FDA criticized Sensiva's EUA applications for failing to provide sufficient information about reAct's expected performance.   The FDA stated specifically, based on the lack of information provided, that "the performance of your device is unknown, which may put patients at unreasonable risk of harm due to inaccurate results."   Among other issues, the FDA identified the following deficiencies with the EUA application that Sensiva knew or should have known about in advance:

  a.   Sensiva represented in its application that unopened reAct kits would have a nine-month shelf life when stored at the appropriate temperature, but Sensiva had not completed *any* testing to support this representation.

  b.   Sensiva made "significant" changes to the reAct kits when it submitted its supplemental applications in January and February 2021 but continued to rely on the same testing performed prior to the submission of its original application in

December 2020.  The FDA stated that this practice was "not appropriate" because "[a]ll validation testing should be conducted on lots of the final, fixed version of your device."

c.  In an effort to demonstrate that the reAct kits worked properly, Sensiva compared the results obtained with a reAct kit to results obtained from another test that had already been authorized by the FDA, but this comparison was flawed because Sensiva did not use the authorized test correctly.  Specifically, Sensiva used saliva samples for both tests even though the comparator test had only been authorized for use with nasopharyngeal samples.  The FDA stated that it was "not acceptable" for Sensiva to rely on this comparison.

d.  Sensiva had not tested reAct on any "low positive specimens," meaning specimens with low viral loads, even though approximately 10-20% of clinical specimens should have been low positive specimens.  In other words, Sensiva did not follow FDA guidance and did not test the reAct kits on specimens in which Covid-19 would be more difficult to detect accurately.

e.  The FDA also cited numerous additional instances in which Sensiva had failed to provide appropriate or sufficient information regarding the composition, efficacy, and safety of the reAct kits.

75.  The FDA demanded that Sensiva conduct substantial testing, including through new clinical trials, to be able to provide the information that was lacking from Sensiva's three applications.  Upon information and belief, Sensiva could and should have collected all this information months earlier, without waiting for the FDA to identify defects in the applications.

76.   BKK had no involvement in Sensiva's testing procedures, nor did it have any prior knowledge of the numerous and substantial flaws with those procedures.

77.   The FDA gave Sensiva 48 hours to submit the missing information, but Sensiva failed to meet this deadline.  Sensiva did not submit any supplement to the application, nor did it request additional time to complete the testing required to obtain the missing information.  Accordingly, the FDA rejected Sensiva's application on April 24, 2021.

78.   Following the rejection, Jolly, Sensiva's attorney, Williamson, Kazenmaier, Frederic, and Griffon participated in a phone call in which the three Sensiva representatives assured BKK that Sensiva intended to complete the required testing that they had failed to perform and, upon completion, would resubmit their application to the FDA.  This, too, turned out to be false.

79.   Between April 24, 2021, and late August 2021, Sensiva did not provide BKK with any updates regarding the purported testing or reapplication for reAct. Frederic told Sensiva's attorney in June 2021 that this extended delay precluded BKK's sales agents from providing full submission packets to foreign countries, which effectively precluded them from selling the product internationally.  (As is discussed below, BKK began efforts in early 2021 to mitigate damages by selling internationally.)  At no point in this time period did Sensiva disclose that *it was not even working on a second application for reAct but was, instead, abandoning reAct and developing a competing product*.

80.   In or about late August or early September 2021, BKK became aware that Sensiva had submitted a new application to the FDA but, upon review of that application, BKK learned for the first time that reAct was *not* included in the submission.  Instead, and without any prior notice to BKK, Sensiva had prepared an application for a *competing* product that served essentially the same

purpose as reAct, but which was rebranded under a new name, "Spectrum," and would have new packaging.

81.    Spectrum and reAct appeared to be essentially the same product, with mostly the same components.  Presumably, the Spectrum kits were also designed to be free from the material defects that had prevented reAct from obtaining approval.

82.    Sensiva apparently believed that the Spectrum kits would not be covered by the Agreement and took that position in its communications with BKK.  In other words, Sensiva was intent on developing a competing product that BKK would be precluded from selling.

83.    If Spectrum was approved, BKK would be in the untenable position of trying to sell the 1.6 million *unapproved* kits it had purchased when potential customers could purchase nearly identical kits from the same manufacturer that *had* been approved.  Further, BKK would not be able to represent that any application was pending for reAct, nor could BKK apply on its own because it was not the manufacturer.  No reasonable consumer ever would be expected make such a purchase even if the reAct kits worked perfectly, which they did not.

84.    Plainly, Sensiva decided to abandon reAct after its application was denied and then decided to keep BKK in the dark about that abandonment for months, while Sensiva prepared a competing product.  In so doing, Sensiva destroyed what little business prospects remained for BKK, leaving BKK with 1.6 million units in unsellable inventory and no ability to recoup its investment that, in total, exceeded $10 million by the end of the 2021 summer.

VII.    **BKK's Efforts To Mitigate Losses Identify Undisclosed Problems With ReAct**

85.    Starting in early 2021, while the regulatory approval process continued to be delayed much longer than Sensiva had suggested it would, BKK became aware that Sensiva's purported

international sales agent was a single-member limited liability company that was inexperienced, unsophisticated, and undercapitalized.

86.     Because international customers might not have the same concerns as U.S. customers about selling a product that had not yet been approved by the FDA, BKK sought to develop an international market for reAct in Europe, India, and Latin America.  BKK had no pre-existing infrastructure, operations, or expertise in foreign markets for the sale of medical devices and supplies, but it was left with no other choice due to Sensiva's failure to obtain approval from the FDA or from the fictional process involving HHS.  All of these efforts to develop a market for reAct oversees were funded exclusively by BKK, with Sensiva's knowledge and approval.

87.     BKK began its efforts to market reAct in Germany in February 2021.  Although BKK initially obtained regulatory approval from German authorities to market reAct in Germany, the subsequent denial of FDA approval rendered this approval meaningless.  Despite BKK's best efforts, German customers reasonably grew concerned that the denial and the absence of any pending emergency use authorization before the FDA suggested that reAct might be ineffective, unsafe, or otherwise unfit for market.

88.     Kazenmaier also utilized his expansive network of contacts in an effort to obtain approval to sell reAct in India, which led to BKK submitting reAct for testing by India's regulatory authorities, Indian Council of Medical Research ("ICMR"), in the spring of 2021.  Through BKK's contacts, Sensiva was even given unprecedented opportunities to give the ICMR Zoom tutorials on how to test the reAct kits.  Still, this testing found the reAct kits to be defective.  Notably, the testing performed by the Indian regulators did *not* exclude samples with low viral loads, as Sensiva had done when applying for FDA approval.

89.   BKK informed Sensiva promptly about the ICMR's determination that the reAct kits were defective.  On May 25, 2021, Williamson stated that there was an "obvious issue" with the seal that Sensiva had affixed to the kits that were sent to the ICMR and he offered to send a new shipment of tests with an improved seal that had "all been extensively tested prior to packaging, and we received very good results, ensuring that this new batch will compare exceptionally against RT-PCR," which he referred to as the "gold standard" test.

90.   Upon information and belief, Williamson knew there was no issue with the seal and, instead, Sensiva was aware that the real reason the reAct kits failed the ICMR's testing is that the kits simply did not work correctly.  They could not identify the presence of Covid-19 accurately unless the viral load was high, and their shelf lives were shorter than Sensiva represented on the packaging.

91.   When BKK received the new set of reAct kits with the updated seals, they submitted them to the ICMR for a second round of testing.  Once again, they failed the tests, proving that the issue had nothing to do with the seals.  In fact, the second round of testing produced even worse results than the first round.

92.   BKK also attempted to sell reAct in El Salvador, Costa Rica, Panama, Romania, Spain, England, and Bangladesh but ultimately was precluded from submitting applications in these countries because BKK was unable to provide a free trade certificate from the FDA, or an equivalent certification that an EUA submission was pending, when no pending application for reAct existed before the FDA.

93.   In late 2021, demand for Covid-19 test kits increased in the United States so substantially that some potential customers became willing to consider purchasing kits that had not yet been approved by the FDA.  After ensuring that such sales would not violate federal law, BKK agreed

to sell 500,000 of its 1.6 million kits to two customers, subject to their satisfaction with the product after conducting their own tests.

94.     The two customers requested samples that they could test to ensure that reAct was effective and safe.  Sensiva sent samples directly to the customers, meaning they were never in BKK's possession and Sensiva was able to ensure the samples were stored properly and had not expired.

95.     Nevertheless, *both* customers reported independently that the sampled kits were defective, either because they failed to detect Covid-19 in subjects who were known to have the virus or because they produced no results at all.

96.     Following the reports from the two potential customers in the United States that the sampled reAct kits were deficient, BKK began to conduct its own tests on the kits in its inventory through an independent laboratory in Germany.  This laboratory also confirmed that the reAct tests did not work. Notably, like the ICMR and unlike Sensiva, the German laboratory did *not* exclude samples with low viral loads from the tests.  Again, like the sample kits provided to the potential customers in the United States, the kits sampled by the laboratory in Germany were stored properly and had not yet expired, according to their stated expiration dates.

97.     On December 9, 2021, BKK informed Sensiva about these customers' complaints.  In response, Jolly, on behalf of Sensiva, stated in an email to BKK that the kits were "about a year old" and could not be sold in the United States, notwithstanding that the expiration dates on the sampled kits had not yet elapsed.

98.     Prior to this email, Sensiva never had informed BKK that the printed expiration dates could not be relied upon, nor had it suggested that the kits could not be sold in the United States. To the contrary, Sensiva had been fully aware of BKK's efforts to market the product in the United

States and had participated in that effort by sending samples of this product, which they knew to be defective, to potential customers.

99.   On December 30, 2021, Frederic emailed Jolly and stated "[w]e are a little confused by your prior email saying product should not be sold in the U.S.  We advanced the component purchase in February based on understanding the product could be sold in the US since it was developed in a CLIA approved laboratory *and US approval could be accomplished automatically with HHS in two weeks*." (emphasis added).  When Jolly responded on January 3, 2022, he did not say anything about the fictional HHS approval process.

100.   In a subsequent email, Jolly, on behalf of Sensiva, revealed for the first time that Sensiva had made modifications to the antigen strip used in reAct kits *after* selling the 1.6 million kits to BKK.  In other words, Sensiva *knew* that the antigen strip used in the kits provided to BKK, and submitted for approval by the FDA, was defective but never said anything when it identified and purportedly corrected that issue in subsequently prepared versions of the kits.

101.   As stated above, the Agreement states explicitly that "Sensiva warrants the Test Kits are free from material defects in material and workmanship under normal use and service with proper maintenance for the time of their intended use following manufacturing.  The term for such warranties shall begin upon Customer's receipt of the Test Kit."

102.   Sensiva's own statements and conduct confirm that they knew this express warranty was false.  The kits plainly were not "free from material defects" when received by the Indian regulators nor were the free from material defects when received by the two customers in the United States.

103.   Given Sensiva's instruction that the 1.6 million reAct kits in BKK's inventory could not be sold in the United States, as well as the inability despite best efforts to sell those kits

internationally, BKK terminated all sales efforts and demanded that Sensiva recall the kits BKK had received, in exchange for full reimbursement of BKK's investment.  Sensiva refused to do so.

104.  In total, BKK has invested more than $10 million in its efforts to finance the development, storage, and sale of reAct kits because Sensiva and its representatives falsely represented, both affirmatively and by omission, among other  things as alleged herein, (i) that reAct would receive automatic approval in approximately two weeks pursuant to a process involving HSS that, in truth, did not exist, and (ii) that reAct was free from material defects and could be used effectively up until the expiration dates printed on the packaging.  Sensiva knew these misrepresentations to be false when made and, by making them, caused the losses alleged herein.

## VIII.   **Control Person Allegations**

105.  Each of the Control Defendants exercised control over Sensiva because of the senior positions they held and continue to hold at Sensiva, which gives them direct control over the day-to-day operations of the Company. Their action and inaction, as alleged herein, caused the misrepresentations to be made to BKK and its partners.

106.  Jolly is a majority or plurality owner of Sensiva who manages many of the day-to-day operations of the company, despite lacking a formal title.  When Sensiva was formed in 2020, Jolly was Sensiva's sole member and manager and he has continued to sign corporate filings on Sensiva's behalf.  Among other actions, Jolly took the lead on all negotiations with BKK and directed the actions of Sensiva's FDA approval procedures.  Upon information and belief, the only reason Jolly does not hold a formal title at Sensiva is because of significant allegations of fraud that have been levied against him in other matters.

107.  Silliman is the CEO of Sensiva and was directly involved in the development and sale of reAct.  The Agreement could not have been signed, nor could the FDA application have been submitted, without Silliman's knowledge and approval.

108.  Williamson is the COO of Sensiva and was directly involved in negotiations with BKK. Williamson signed the Agreement on Sensiva's behalf, as well as the amendments thereto.

109.  Sensiva could not have drafted and entered into the investment contract with BKK without the knowledge and approval of the Control Defendants, nor could Sensiva have developed reAct, developed Spectrum, made decisions about the shelf life and efficacy of either product, or submitted applications to the FDA without the knowledge and approval of the Control Defendants.

110.  At all times, Jolly, Silliman, and Williamson held themselves out to be principals of Sensiva, with Jolly managing the regulatory and transactional business for the Company, Silliman managing the medical and scientific business of the Company, and Williamson managing the logistical, financial, and technological business of the Company.

**IX.**     **No Safe Harbor**

111.  The statutory safe harbor provided by the Private Securities Litigation Reform Act for certain forward-looking statements does not apply to any of the misrepresentations alleged herein because such misrepresentations were not forward-looking statements.   Sensiva represented falsely that a procedure existed by which reAct could be approved for sale within two weeks when Sensiva knew such procedure did not exist.  Sensiva further failed to disclose known defects with reAct at any time.

**X.**      **Pending Litigation**

112. On February 1, 2022, BKK, Sensiva, Jolly, and Williamson entered into a tolling agreement to toll any applicable statutes of limitation that may be running on potential claims they

may have had against each other. BKK served a notice on March 21, 2022, that it intended to terminate the tolling agreement 45 days later (meaning on May 5, 2022).

113.  On May 5 and 6, 2022, both BKK and Sensiva filed lawsuits against each other in the Civil District for the Parish of New Orleans, in which they each asserted claims against the other under various theories of state law

114.  Sensiva moved to consolidate the two cases but no material proceedings have occurred as of the time of filing.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Sensiva, Jolly, and Williamson)**

115.  BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

116.  Defendants Sensiva, Jolly, and Williamson, individually and collectively, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

117.  Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder recognize that is unlawful for any party "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security." 17 CFR § 240.10b-5.

118.  The term "security" is defined to include, among other instruments, an "investment contract."  15 USC § 78c(10).  An investment contract exists when the following three elements are satisfied: "[F]irst, that there is an investment of money; second, that the scheme in which an investment is made functions as a common enterprise; and third, that the under the scheme, profits

are derived solely from the efforts of individuals other than the investors." *Matter of Living Benefits Asset Management, LLC*, 916 F.3d 528, 535 (5th Cir. 2019) (quotation omitted). The term "solely" in the third element is not construed literally but, instead, requires only that "efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* (quotation omitted).

119. The Agreement, along with its amendments, is an investment contract. Under the Agreement and its amendments, BKK invested more than $10 million to fund a common enterprise of manufacturing reAct kits for sale to the public. Defendants Sensiva, Jolly, and Williamson, alone, controlled the manufacturing and approval processes for reAct, meaning only those Defendants controlled whether their enterprise would be able to sell an effective and approved product to the market. BKK and Defendants Sensiva, Jolly, and Williamson knew that BKK would be unable to realize any profit on its investment unless and until Sensiva used that investment to deliver a marketable product with regulatory approval for sale within the United States.

120. Defendants Sensiva, Jolly, and Williamson made false and misleading statements of material facts, or omitted material facts that they had a duty to disclose, and/or omitted to state material facts necessary to prevent other statements that they made from being misleading. Specifically, each of these Defendants falsely represented, both affirmatively and by omission, among other things as alleged herein, (i) that reAct would receive automatic approval in approximately two weeks pursuant to a process involving HHS that, in truth, did not exist, and (ii) that reAct was free from material defects and could be used effectively up until the expiration dates printed on the packaging. Such false statements and omissions appeared in both written and oral communications, as described above.

121.  Defendants Sensiva, Jolly, and Williamson intended to deceive, and did in fact deceive, BKK and its affiliates, partners, members, and employees to induce BKK to invest more than $10 million in a business that Defendants Sensiva, Jolly, and Williamson knew could not be successful because government approval was unlikely, the product was deficient, or both.

122.  Defendants Sensiva, Jolly, and Williamson knew that BKK would rely, and BKK did in fact rely, on these misrepresentations and omissions in deciding to invest more than $10 million into this business, which they did not know at the time had no reasonable prospects for success due to significant issues that were known only by Defendants Sensiva, Jolly, and Williamson.

123.  Accordingly, Defendants Sensiva, Jolly, and Williamson are liable to Plaintiffs for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Control Defendants)**

124.  BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

125.  As alleged above, Sensiva violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements of material fact, or omitting material information, in connection with the purchase or sale of an investment contract with BKK.

126.  Such fraudulent conduct was committed knowingly, and such knowledge is imputed to each of the Control Defendants who knew of, or recklessly disregarded the falsity of, such statements and omissions.

127.  The Control Defendants were controlling persons of Sensiva at the time the false statements and omissions were made and remain controlling persons of Sensiva today. Each of them is a senior executive at Sensiva, with authority to influence Sensiva's day-to-day operations. Sensiva could not have drafted and approved the investment contract with BKK without the knowledge and approval of the Control Defendants, nor could Sensiva have developed reAct,

developed Spectrum, made decisions about the shelf life and efficacy of either product, or submitted applications to the FDA without the knowledge and approval of the Control Defendants.

128.   The Control Defendants must have known, or acted with reckless disregard for the truth, that Sensiva's representations to BKK were false or, at minimum, misleading.

129.   But for the fraud that the Control Defendants permitted Sensiva to make, BKK would not have invested more than $10 million into this business.

130.   Accordingly, the Control Defendants are liable to BKK as controlling persons of Sensiva, in violation of Section 20(a) of the Exchange Act.

## <u>COUNT III</u>

### (Breach Of Contract Against Sensiva)

131.   BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

132.   The Agreement is a binding contract between BKK and Sensiva, supported by consideration from both sides.

133.   Sensiva represented that the reAct kits were free from material defects.  In fact, the reAct kits were not free from material defects. As confirmed by numerous, independent tests after the Agreement was signed, including those conducted by customers who receive the reAct kits, the reAct kits failed to detect the presence of Covid-19 in known cases, and/or failed to provide any results at all.  The kits including such issues had not yet expired according to the expiration dates set by Sensiva and had been stored pursuant to Sensiva's specifications.  Only an inherent defect in the kits themselves explains these issues.

134.   Because the reAct kits did not provide accurate or reliable results, they could not be sold. As such, BKK could not realize any profit on its investment of over $10 million to develop, transfer, store, and market reAct kits.

135.  Sensiva's knowledge that the reAct kits were defective and their efforts to conceal these defects demonstrate that Sensiva acted in bad faith.

136.  BKK has suffered damages because of Sensiva's breach of the Agreement.

## COUNT IV

### (Rescission Of Contract Against Sensiva)

137.  BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

138.  Under Louisiana Civil Code Article 1949, "[e]rror vitiates consent when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." A "cause" is defined as "the reason a party obligates himself." La. Civ. Code art. 1967.

139.  At all relevant times, Sensiva knew that BKK would not commit more than $10 million to develop, transfer, store, and market reAct kits unless BKK believed (i) that reAct would be approved for sale in the United States in short order, and (ii) that reAct was free from material defects that would render it unsuitable for use by consumers prior to the expiration date for the kits.

140.  Accordingly, Sensiva convinced BKK that these false facts were true and then allowed them to continue to believe these facts were true while, in truth, Sensiva  (i) knew that there was no procedure by which imminent approval for reAct could be obtained, (ii) developed a competing test kit in secret that *could* be approved by the FDA and that was free of the material defects in the reAct kits, and (iii) misrepresented facts about the reAct kits and the approval process for such kits.

141.  The cause of BKK's entry into the Agreement—assurance of imminent approval of a product free from material defect—was the result of BKK's erroneous belief that Sensiva had been

honest in representing such facts to be true. Such error vitiates BKK's consent to enter into the Agreement.

142.  Under Louisiana law, BKK is entitled to be restored to the position it was in before entering into the Agreement, including, at minimum, by restoring BKK's $9.8 million investment to BKK.

## COUNT V

### (Fraud And/Or Negligent Misrepresentation Against Sensiva, Jolly, And Williamson)

143.  BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

144.  As is set forth above, Sensiva and its agents, including Jolly and Williamson, made various material misrepresentations and omissions in a clear attempt to obtain an unjust advantage in Sensiva's business relationship with BKK.  Specifically, Sensiva, Jolly, and Williamson falsely represented, both affirmatively and by omission, among other things as alleged herein, (i) that reAct would receive automatic approval in approximately two weeks pursuant to a process involving HHS that, in truth, did not exist, and (ii) that reAct was free from material defects and could be used effectively up until the expiration dates printed on the packaging.  Such false statements and omissions appeared in both written and oral communications, as described above.

145.  Sensiva, Jolly, and Williamson knew or should have known these representations to be false when made yet made no effort to correct or otherwise disclose their falsity to BKK.

146.  Sensiva, Jolly, and Williamson intended to deceive, and did in fact deceive, BKK and its affiliates, partners, members, and employees to induce BKK to invest nearly $10 million in a business that Defendants knew could not be successful because government approval was unlikely, the product was deficient, or both.

147. Sensiva, Jolly, and Williamson knew BKK would rely, and BKK did in fact rely, on these misrepresentations and omissions in deciding to invest more than $10 million into this business, which they did not know at the time had no reasonable prospects for success due to significant issues that were known only by Defendants

148. Each of the misrepresentations detailed above, if not made intentionally, at minimum constitutes negligent misrepresentation.

## COUNT VI

### (Violation Of LUTPA Against All Defendants)

149. BKK repeats and incorporates ever allegation set forth above as if fully set forth herein.

150. Section 51:1405 of the Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Such unfair practices that are prohibited under LUTPA include fraud, deceit, and misrepresentation.

151. As is detailed above, all Defendants engaged directly or indirectly in acts of fraud, deceit, and misrepresentation to obtain an unjust advantage in their business relationship with BKK and to induce BKK to pay Sensiva $9.8 million so that Sensiva could develop the reAct kits without risk of loss.

152. As such, all Defendants violated LUTPA, and such violation remains continuing.

153. On June 13, 2022, the Louisiana Attorney General issued a notice to Sensiva, Jolly, and Williamson, pursuant to Section 51:1409 of LUTPA, putting them on notice that this claim had been asserted in the state court proceedings and that Plaintiffs may be entitled to treble damages.

## COUNT VII

### (Violation Of Louisiana Civil Code Art. 2315 Against All Defendants)

154.   BKK repeats and incorporates every allegation set forth above as if fully set forth herein.

155.   Under Louisiana Civil Code art. 2315, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

156.   All Defendants caused BKK damage by misrepresenting material facts, including that automatic HHS approval was possible, that the reAct tests had a certain shelf life, and that the reAct tests worked as intended.

157.   As a result of these wrongs, BKK has suffered damages, which include but are not limited to all amounts paid to Sensiva, out-of-pocket costs incurred to mitigate damages, and lost profits.

## PRAYER FOR RELIEF

158.   WHEREFORE, BKK respectfully demands judgment as follows:

a.      Determining and declaring that Defendants violated Sections 10(b) and/or 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder;

b.      Determining and declaring that Sensiva breached the Agreement;

c.      Determining and declaring that Sensiva, Jolly, and Williams committed intentional fraud and/or negligent misrepresentation;

d.      Determining and declaring that Defendants violated LUTPA and Louisiana Civil Code art. 2315;

e.      Requiring Defendants to pay all damages sustained by BKK because of Defendants' actions and transgressions described above;

f.      Issuing an order rescinding the Agreement;

g.      Awarding BKK pre-judgment and post-judgment interest, as well as their

reasonable costs and expenses incurred in this action, including but not limited to reasonable

attorneys' fees, expert fees, and other costs; and

h.      Granting such other relief as the Court deems appropriate.

Dated July 13, 2022.

Respectfully submitted:

/s/ Thomas M. Flanagan
Thomas M. Flanagan (#19569)
Camille E. Gauthier (#34558)
Alixe L. Duplechain (#39167)
**FLANAGAN PARTNERS LLP**
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
Telephone: (504) 569-0235
Facsimile: (504) 592-0251
tflanagan@flanaganpartners.com
cgauthier@flanaganpartners.com
aduplechain@flanaganpartners.com

David Kelley (*pro hac vice to be requested*)
David Kotler (*pro hac vice to be requested*)
Brian Raphel (*pro hac vice to be requested*)
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone: (212) 698-3580
Facsimile: (212) 698-0460
david.kelley@dechert.com
david.kotler@dechert.com
brian.raphel@dechert.com

*Counsel for BKK Solutions, LLC*